Case number 13-6387 Terry Lynn King v. Bruce Westbrooks Arguments not to exceed 30 minutes per side. Ms. Chavez, for the appellant, you may proceed. May it please the court, counsel. I'd like to reserve seven minutes rebuttal time, please. First, I'd like to highlight facts that provide an important context for this ineffective assistance of counsel claim. Then I'll address the state court's decision on counsel's deficient performance. And then what I'd really like to focus on is the heart of King's ineffective assistance of counsel claim, which is prejudice. Trial counsel testified at the post-conviction hearing that from the very beginning of this case, he knew four important things. First, counsel knew that guilt was not an issue. Terry King had confessed to the crime. So counsel determined that the sole avenue of defense was not guilt, but the degree of guilt, that being that this was not a first-degree murder case. And this determination is based on the second fact that counsel knew and proceeded under, which is that at the time of the crime, Terry King had ingested an extraordinary amount of alcohol and drugs. The third thing that counsel knew was that Terry King had a history of emotional trauma, of polysubstance abuse, and of head trauma. And counsel knew that those things were red flags for brain damage. And finally, the fourth thing that counsel knew was that he needed an expert to provide evidence of Terry King's mental state at the time of the crime, both for the guilt phase of the case and also for the penalty phase of the case. But for the six months from the time counsel was appointed to this case in July to January, when the trial began, counsel did not have an expert, counsel did not obtain an expert, in order to conduct an adequate mental health investigation. That was because he thought that the family or the defendant had to pay for the expert and didn't know that there could be essentially a court-appointed expert, is that right? That's correct, Your Honor. Counsel was proceeding under an ignorance of the law. He did not know that state law provided funding for an expert, so instead he required his indigent counsel to come up with the money to pay for an expert in his defense. And it wasn't until right before trial, until January, when Terry King's family was able to come up with that money. And so it was after the very first day of jury selection that an expert actually interviewed Mr. King. And again, in his post-conviction testimony, he testified that that's due to the fact that he did not know about the law. And we also saw that testimony in Appendix 191, and the state actually concedes counsel's ignorance of the law in its brief at Footnote 3. So every action by counsel has to be viewed with this in mind, because these were the circumstances that were facing counsel at the time of this trial. And ultimately, counsel presented no expert evidence on King's mental state at either the guilt or the penalty phase of trial. Now, the state court denied King's ineffective assistance of counsel claim by unreasonably determining that counsel's actions were based on strategy. This determination is both legally and factually unreasonable. The state court unreasonably applied Strickland because, as stated in Hinton v. Alabama, we know that counsel's ignorance of law on a critical aspect of the case is the quintessential example of deficient performance. And in this case, because of counsel's ignorance of the law, he did not know that funding was available for his expert. He failed to timely obtain expert assistance, and he failed to conduct an adequate mental health investigation. In addition, that failure to conduct the adequate investigation means that counsel could not have strategic decisions, could not make strategic decisions with respect to the defense that was presented. And the state court's decision unreasonably applies Strickland in this respect because it does not examine the adequacy of counsel's investigation. So without that adequate investigation, there can be no strategic decisions regarding the defense. So there should be no question, based on Hinton v. Alabama and the undisputed fact of counsel's ignorance of the law in this case with respect to expert funding, there should be no dispute that we've satisfied 2254-D1 with respect to deficient performance because the state court unreasonably applied the law. Now you did, the trial counsel did get this expert, I think this was Gibbro, how do you pronounce his name? I believe that's correct. I believe that's correct. It was Gibbro who did say that he thought it might be helpful to have an EEG testing to see if there was organic brain damage, right? That's correct. Dr. Gibbro believed there was an excellent chance, based on Terry King's history of inhaling toxic substances from the beginning of age eight, several years up until age 16, when he then began to use alcohol and move on to drugs. And based on that history, Dr. Gibbro believed there was a significant chance that Terry King did have brain damage. And counsel knew, just based on that social history, that those are red flags for brain damage. But because Dr. Gibbro did not interview Terry King until the day of jury selection, there simply was no time for Dr. Gibbro to complete a full and adequate investigation of Terry King's mental health. And Dr. Gibbro said so. He said he only had a preliminary report. He was unable to render a final opinion for counsel with respect to Terry King's state of mind. Now, there was Dr. Abel, who was a psychologist. Why was what she testified to, why was that not enough to alleviate the problems that Gibbro saw as potential problems? Dr. Abel was the expert that testified in post-conviction proceedings. So she never testified even at the penalty phase? She did not. That would have been Dr. Booher that perhaps you're referring to. And Dr. Booher was actually retained by counsel after the jury returned its guilty verdict. And he testified in the penalty phase only to the general effects of the drug and the alcohol upon an ordinary person. And he testified to the length that those effects would last. Dr. Booher testified in no way specifically regarding Mr. King because he hadn't even met Terry King. He was simply a pain too late in the process to meet with Terry King and be able to make a connection between those facts of the extreme amounts of intoxicants that Terry King had consumed and the effects on Terry King's state of mind at the time of the crime. So Dr. Abel, I was thinking about her, but I was not focused on the fact that she was at post-conviction. Did Dr. Abel have in front of her the report of Dr. Kaminsky, who actually did perform an electroencephalogram on King? I believe that Dr. Abel had Dr. Kaminsky's report, but I don't believe that there ever was an EEG that was performed on Terry King. That was a matter that was contested at the post-conviction hearing. Now, the prosecutor indicated that an EEG had been conducted, but defense counsel indicated they were not aware that that had been done. I thought that there was something in, maybe it's in the APELY's appendix at 255-56, Abel's testimony at 167-68, that Abel testified, and I want to be corrected where I'm wrong, that there was an EEG that showed negative results, and that it had not been determined whether there was organic brain damage. I'm just trying to figure out, is that a correct statement, or am I misunderstanding the record here? Your Honor, if that's what the transcript says, then I'm going to go with that. But importantly, the EEG is not the end-all of the inquiry into brain damage, and I believe Dr. Abel indicated that there was other testing that could be done that could establish brain damage. And even Dr. Gebro, at the Saturday before opening statement, he testified in a jury-out hearing before the court, because trial counsel wanted a transportation order so that Terry King could be subjected to further testing. In Dr. Gebro's testimony during that hearing, he indicated that the EEG, if those results came back negative, that still didn't preclude brain damage. He indicated that he needed results of neuropsychological testing, and he also, importantly, he needed information that defense counsel had not provided him. In our brief at footnote 2, we list that information that defense counsel had not provided Dr. Gebro. In fact, the prosecutor at that hearing impeached Dr. Gebro, because he didn't have full information, and that's one of the reasons why the trial court didn't allow for that order to transport King for further testing. So what I'm trying to get at, probably, is the question about prejudice. If we assume for the moment that there was deficient performance because of the fact that the trial counsel clearly was wrong in his understanding of the law and financing an expert here, don't we need to see whether there's prejudice? And if we need to look at these three doctors whose testimony arises at the federal habeas stage, do we have a problem, if that's all we can look at, to say that there is prejudice? We do not have a problem. And that's because Dr. Abel provided testimony and evidence of a unique quality of a different category of evidence than what was provided to the trial in this particular case. So based on Dr. Abel's testimony alone, based on the state court record, we can establish prejudice. So I'm a little bit confused about what you mean. What did Dr. Abel say that shows prejudice in your view? Your Honor, to explain Dr. Abel's testimony and what was prejudicial, I'd also like to address the state court's opinion with respect to prejudice that begins at page 333, where the state court indicated that Dr. Abel's testimony provided very little information that was previously discovered by Dr. Gabbro. And I'd like to explain by comparing and contrasting the two why that's an unreasonable determination by the state court that would get us through AEDPA deference to the federal court evidence. So for example, Dr. Gabbro, first of all, did not have a final opinion. He only had a preliminary report. Dr. Abel did have a final opinion. And Dr. Abel testified that had Terry King not been intoxicated, the crime would not have happened. She testified that at the time of the crime, Terry King was overwhelmed. He was unable to accurately interpret the situation, and he sought out advice from his co-defendant, Joe Sexton. She testified that Terry King's level of intoxication exacerbated his pre-existing impaired judgment, and that led to his poorly considered behavior at the time of the crime. She spoke to Terry King's emotional disturbance that resulted from him losing his father at the age of 8 years old, and that Terry King needs the approval of others, that he has low self-esteem. He's a follower, not a leader, and therefore susceptible to the influence of co-defendant Joe Sexton. And she talked about King's predisposition to substance abuse due to his already poor impulse control and his impaired judgment. And all of this is important because we're not talking about just a person going to a bar and becoming intoxicated. We're talking about Terry King and his underlying conditions and the effect of this extreme amount of intoxication. Terry King drank a case and a half of beer. He had not one, not two, but three Quaaludes throughout the day. He had not one, but two, and possibly three tablets of LSD that evening before the crime occurred. And intoxication to that extreme amount on Mr. King's already damaged brain and his already pre-existing poor judgment meant that it had a greater effect on him than just an ordinary person. And that's something that an ordinary juror simply would not be able to glean from the information that trial counsel presented to the jury because trial counsel did not present any expert evidence of this type. It's important that... So, I apologize to you for this question if it doesn't fit right. But my understanding were there were two areas of IAC. One was intoxication and one was not getting an expert to examine him for organic brain damage. It seems like from your answer now that you're merging the two together. And it seemed to me that there were two separate IAC claims. Am I missing something here? There are two separate claims with respect to intoxication and then with respect to brain damage. And let's focus just on the intoxication right now. But when I speak to King's underlying personality characteristics, the fact that... But the intoxication, I thought we had started out saying that there was deficient performance because he didn't know he could get an expert. But I thought that was the expert for organic brain damage.  Because counsel's strategy here was to show the effects of intoxication and brain damage on Terry King. Because counsel had all these red flags, he knew that these factors were out there and he knew he needed an expert to link those facts to King's state of mind. But did he present an intoxication defense? I thought he did not because there was this other witness who said that he, Terry King, had done much the same thing to a woman who was not killed and who lived to testify that he was sober when he had attacked her in a very similar way but not killed her. And returning to the deficient performance prong of the claim, because that's where the state court discussed the Laurie Carter testimony, who was Terry King's ex-girlfriend. If we look at page 331 of the state court opinion, I'd like to go over it with you and explain why this is an unreasonable factual finding. The state court opinion relies on trial counsel's post-conviction testimony that Laurie Carter testified that King was sober during an alleged attack that happened about a year before this crime. Now, that is not a valid fact because it's flatly contradicted by the transcript of Carter's testimony. And the state concedes in its brief at footnote 1 that Laurie Carter did not testify that King was sober during that alleged attack. So the state court decision that rests on that unreasonable factual finding is also unreasonable and we would pass through 2254D2 on the deficient performance prong. If you want me to continue just briefly with the deficient performance. I realize I've monopolized the questioning here, so I don't want to deter you from going down the path you would like to go down. Okay, well just very briefly to finish out the deficient performance so that we can then focus on prejudice, which is really obviously at the heart of the case. The state court decision with respect to deficient performance also relied on other unreasonable factual findings that are contradicted by the state court record. And if we look at the court opinion on page 332, the court again found that there was a strategic decision not to present Dr. Gebro. And one of those reasons was because counsel testified that Terry King lied to Dr. Gebro during that interview after the first day of jury selection. That Terry King said that the co-defendant was responsible for the killing. This is contradicted by the state court record because if we look at Dr. Gebro's preliminary report, which is in the district court docket at 254-3, if we look at his report, it says that Terry King admitted to the killing. And if we look at the other information from Dr. Gebro, from his affidavit that was presented in support of that motion for further testing, that's in appendix 26, if we look at that testimony of Dr. Gebro, during the hearing on that Saturday before opening arguments on Monday, and at that hearing where he was vigorously cross-examined, Dr. Gebro indicated nothing with respect to Terry King not taking responsibility. And further, to go to the second reason proposed for a strategic decision, none of that evidence supports the idea that Dr. Gebro told trial counsel that Terry King enjoyed hurting people. There's no support for that statement just as there was no support for trial counsel. Well, there is support for it because there was testimony about it. It's just Gebro's testimony does not support it. Correct. Dr. Gebro. It's not that there's a lack of evidence in the record. It's just that there's evidence from which a different conclusion might be drawn. There's evidence from trial counsel, the same trial counsel who said that Laurie Carter testified that King was sober. We know that the record contradicts that testimony. The same trial counsel who said that Terry King lied to Dr. Gebro during that evaluation. We know that. But this is his trial, King's trial counsel. Yes. You're saying these things which are against the interest of King. And the trial counsel is saying this in post-conviction, is that where it is? Yes, Your Honor. To justify why trial counsel didn't call Gebro or didn't present evidence of intoxication as a defense. Yes, that's trial counsel's after-the-fact justification. And we know that that's not the reason that Dr. Gebro was not presented. Because at the time, because trial counsel would have known about those supposed facts at the time that he stood up in opening argument and he promised the jury that he would present evidence about the effects of extreme intoxication on King's mental state and that King could not be held responsible for first-degree murder. So what do we do with what now appears to be the situation with the trial counsel of King saying in the post-conviction process, Laurie said that King was sober and Gebro said that King liked to hurt people and Gebro denying that and there's some evidence that Laurie didn't say it. In other words, looking at the testimony. Correct. So do we have like a fact controversy here? There's absolutely no controversy here. These are unreasonable factual determinations. The state court record shows that these facts relied upon by the state court that those facts that their ultimate decision rests upon were unreasonable factual findings under 2254D2. Now, correct me if I'm just missing something here because I sure could be. But when you say that the record doesn't support Dr. Gebro's saying that Terry King liked to hurt people, counsel testified, as I remember, that it wasn't in Dr. Gebro's report but that Dr. Gebro had indicated that. So what is, remind me again, what is the basis for saying that it simply is contrary to the record? Your Honor, I cede my time. Please, answer. Thank you. The basis for that is that even assuming that that fact occurred, that fact did not come out in the cross-examination of Dr. Gebro at that jury out hearing and therefore would not have hurt Terry King, but also trial counsel knew those things, supposedly. He knew those things at the time that he stood up in opening argument and he promised that he was going to present this evidence of the effects of intoxication on Terry King at the time of the crime, and that's why Terry King would not be guilty of first-degree murder but guilty of second-degree murder. So trial counsel supposedly knew that Laurie Carter had said that King was sober when King attacked Laurie Carter? No, Your Honor, because Laurie Carter never said that. And then I know it's difficult, but it doesn't make sense. It's not supported by the record. Well, I was just going to say, but did trial counsel know that Laurie King was going to testify as she did when he made his opening statement, or did that come as a surprise? Laurie Carter's testimony, he knew she was going to testify, but he didn't know what she was going to testify about. And you're also saying to us that at trial, when Laurie Carter testified, Laurie Carter did not say King was sober. She did not say that. And she didn't say he was intoxicated either. There was no testimony on it. Is that right or not? That's correct, Your Honor, but still. So it's incorrect that she said he was sober. What you would have to do is say that you can draw an inference of sobriety for a failure to mention intoxication, which might be problematic, but that's an accurate description of the record, right? Your Honor, the accurate description of the state court opinion, which is what we're reviewing here, is that trial counsel, solely in response to Laurie Carter's testimony, abandoned the intoxication defense. And we know that that's an unreasonable factual determination because Laurie Carter did not testify that King was sober. So as instructed by Congress under 2254D in the Supreme Court when we're looking at this recent state court decision, this is what we're examining. Does it matter whether Laurie Carter does or doesn't say that King was sober when Laurie Carter was attacked? In other words, the essence of the intoxication defense would be, hey, King didn't understand what he was doing here. He couldn't plan this out. He was out of control, et cetera. But if he had done the same type of thing to Laurie Carter, whether or not he was intoxicated, would that not make the intoxication defense a less valuable defense anyway? It would not happen. This is the reason why. Because at the time after Laurie Carter testified, defense counsel presented two witnesses that completely impeached Laurie Carter's testimony. And impeaching Laurie Carter, which is what the state court said became the defense, and he turned an intoxication defense into an impeachment defense. But impeaching Laurie Carter's testimony is in no way inconsistent with this intoxication defense. So no, Your Honor, there was evidence that should have been presented with respect to the effect of Terry King's intoxication at the time of the crime. We know it wasn't presented because counsel didn't obtain an expert in time and he did not conduct an adequate investigation. And the fact that there is no adequate investigation means there is no strategic decision here. There simply can't be. My time has expired. Yes, and you will have your seven minutes. Thank you. Hey, police and court. I'm Jennifer Smith with the Tennessee Attorney General's Office representing the warden. Just to go to Judge Moore's question, there are two distinct issues on which the court granted a certificate of appealability and each of them, as you all have been discussing, is each complicating factor. So I'm going to address each one starting with the Laurie Carter testimony. On that claim, the petitioner argues that the way it was presented to the state court and the way it was granted in the COA to this court, the claim is that counsel was ineffective for foregoing evidence of intoxication at the guilt phase after promising the jury in opening statement that he would present testimony about his intoxication, specifically by a witness named Don King, who was Terry King's cousin. The Tennessee Supreme Court disposed of that claim on the merits and determined that counsel's decision to forego additional intoxication evidence at the guilt phase was in direct response to the surprise testimony of Laurie Carter at trial. Specifically, the state presented the testimony of Ms. Carter under Rule 404B regarding a prior assault by Terry King and the court specifically instructed the jury that they consider the testimony on the issues of premeditation, intent, malice, and motive. That was specifically what the jury was told that Carter's testimony was relevant to and that they could consider it for that reason. What did Carter say vis-a-vis sober or intoxicated when she says King attacked her? Carter did not testify about Terry King's mental state. Her testimony didn't have anything to do with intoxication or not. She didn't say he was sober, not sober. She didn't talk about drugs or the use of drugs. Her testimony actually began with a description of him approaching her in a parking lot and knocking her out cold with a lead rod wrapped in leather that she called a slapstick. She was not unconscious. She then described how he rolled her hair up in the car window to restrain her and he continued to beat her throughout the course of the day and she was lapsing in and out of consciousness while he asked her what it felt like for him to die. So she didn't testify to that. So she didn't say anything. She did not. And yet the state court said that the reason why King's lawyer did not present evidence of intoxication was because Lori Carter had said that he was sober. Am I correct in making that statement? I would disagree with that characterization of the state's opinion. Yes, we agreed that there is a factual misstatement in the Tennessee Supreme Court's opinion on post-conviction and it's specifically the sentence that says that Ms. Carter testified that the appellant was sober when he attacked her. She did not testify to that effect. But that, we submit, is not the material fact which drove the court's decision with respect to counsel's decision. Counsel testified. Why would counsel make a decision about introducing evidence of intoxication if Lori Carter had not said that King was sober when King attacked her? Well, because the Lori Carter testimony changed everything. The Lori Carter testimony was the turning point in the trial. Why does it change the intoxication defense for this particular crime? It changes the intoxication defense because the Lori Carter testimony put into perspective King's actions in the Diana Smith murder. So now, the Diana Smith murder is no longer just a one-off impulse in response to a convergence of a rape allegation and intoxication. What if he had been intoxicated, both of them? That would have been fine. I mean, I don't think that would have mattered. Well, shouldn't his counsel have presented evidence that he was intoxicated, especially at this murder that we are dealing with today? I know, Your Honor. And let me explain. Counsel explained this at the post-conviction, and I would just correct. There's been some allegations, I think, and I don't think they were deliberate allegations, but counsel did not testify that Lori Carter testified that she was sober. Counsel specifically said on page 291 of the appendix that the Lori Carter testimony was devastating, nearly beating her to death the way she described it with her hair rolled up, asking her if she was dying. He said in the course of that description that this attack occurred apparently while he was sober. He didn't testify that she – he obviously took the testimony as meaning that she was sober, but he did not report that she – or testify that she testified to that effect. But he certainly took it to be so. But it seems to me, and I think it seemed to the state courts and to trial counsel, it wasn't the sobriety or lack of sobriety that was the turning point. It was the fact that all of a sudden when Terry Carter says to his co-defendant, Mr. Sexton, I knew what I had to do when she said that I had raped her. That all makes sense now because now we've got Lori Carter saying that he said to her, tell me what it feels like for you to die. I need to know what that feels for the next woman that I kill. And so this is putting this person not as someone who just gets intoxicated and had this impulse. This is someone who's dangerous. This is someone who deliberately harms women. It established a motive. Even in the Joe Sexton statement, introduces the guilt phase. Suppose hypothetically – and I'm truly trying to understand this. Suppose hypothetically King or a similar defendant was completely intoxicated so they truly did not know what they were doing. Would that not be a relevant defense to the crime here, whatever you call it in Tennessee, voluntary intoxication? Would that not be a defense? If there were proof that Terry King was intoxicated to the extent that he lacked the capacity to premeditate murder, that would be a defense. That's not what the promised testimony of Don King would have established. That's not what Dr. Booher testified to even in sentencing. And counsel knew that. Counsel knew it was a long shot. And I think what counsel was thinking from my reading of the testimony is – and he admitted it was a long shot going in – was that if they could just let the jury know how much he had consumed, it might plant a seed of doubt in their mind about his mental state. But he never had the level of proof necessary to establish a voluntary intoxication defense. He wouldn't have gotten that instruction even if he had presented the proof that he had at the guilt stage. But it really doesn't – in terms of his decision making in response to the Carter testimony, as far as Strickland is concerned, I mean, Strickland recognizes that counsel make decisions and respond to things in the heat of trial in various ways. And the state court found that that was a reasonable decision made in response to unexpected testimony. And it wasn't because of lack of investigation. He tried to find Ms. Carter. He knew that Carter was listed as an expert on the state's indictment and knew that Carter had an assault warrant out against Terry King. He tried to locate her, couldn't find her. So it was a surprise what Carter testified to. Substance of her testimony. Yes, it was. Because there was no way that the defense counsel could find out Carter's testimony, given the circumstances that were going on. That's correct. She was avoiding him. Her address was listed as care of a detective. He contacted the detective and asked the detective to let her know that he wanted to speak with her. She never contacted him. There was no responsibility of anybody to produce her? No, there was not, Your Honor. No, there was not. And so the substance of her testimony. And in the warrant, and this is one of the ways that counsel, when he was faced with this, and again, this was very vivid, graphic, damaging testimony on which, again, the trial court specifically instructed the jury, you can consider this for premeditation, malice, motive, and intent only. As I read the situation, the import of the Carter testimony is that it has a tendency, whether King was intoxicated or not at the time of the attack on her, it has a tendency to undermine the notion that his intent was somehow undermined on the occasion on which Ms. Smith was murdered. I would agree with that, Your Honor, and I think that was what was so devastating about it. It's one thing to deal with one incident where you're in a drunken rage and you do something that's out of character. But when the state presents another very similar attack, and not only the attack of the viciousness and the statement that he made about, how do you know, I need to know how you feel so I know the next time I kill the next woman, he also took her to his cousin, and Lori Carter testified she overheard him say, I need to get rid of her body in the quarry, will you help me? So again, this ties right into what happened with Diana Smith and the way that he disposed of the body in that case. So that undermines this. This is just sort of, again, it's a sort of one-time impulsive instance. But as Your Honor said, it's certainly possible that in two separate occasions he could have had a mental disturbance to the same level. But at that point in the trial, counsel, knowing all the evidence, and the evidence was overwhelming, not only were there statements that he made about, I knew what I had to do when she accused me of rape, he put her in his car, he drove around, he drove to his cousin's house, he procured a weapon, took her out, executed her, and then, you know. But defense counsel, tell me, I'm sorry I don't recall, did the defense counsel present evidence at the trial of the ingestion of huge amounts of alcohol, the Quaaludes, and the other substances? There was testimony presented at the guilt phase of trial about the ingestion of substances that came in through the statement of Terry King, that came in through the statement of Jerry Childers. So yes, at the guilt phase, there was testimony about ingestion of large amounts of drugs. The only thing that didn't come in was a separate testimony from Don King, who was one of the individuals that they visited in the course of the day when he was with Ms. Smith before her murder. Is Don King a brother? He is a cousin, and he testified at the sentencing phase, and that was at the point that counsel decided he's not going to, you know, we're not going to prevail on this intoxication defense. We're not going to avoid a conviction here, so I'm going to focus on developing a mitigation case with using the intoxication as the basis of it. But there had already been some evidence of intoxication at the guilt phase. The guilt phase. Yes, Your Honor. It was just that counsel decided not to present any more evidence on that after Ms. Carter's testimony. That's correct, and the state court acknowledged that there was testimony. There was some testimony. It's not as if there was no testimony. He just didn't present the additional testimony from Don King to corroborate the Jerry Childers testimony, and he did not present the testimony of Dr. Booher, who was an addiction specialist. He did present him in the guilt phase. At Booher in the penalty phase. I'm sorry, in the penalty phase. Yes, Your Honor. But even Dr. Booher's testimony with respect to a voluntary intoxication defense, Dr. Booher did not and could not testify that Terry King lacked the capacity to form a mental state. So in cases more recent than this, you know, there are many cases in which that type of expert testimony is actually excluded at the guilt phase because he can't opine on the ultimate question of the mental state. The only thing that Dr. Booher testified to in the sentencing phase was to the effect of the large quantities of drugs on the body, how long it lasts, and the fact that such quantities would result in an impairment of judgment. So that really does not even rise to the level, again, of a voluntary intoxication defense. So counsel, already knowing that he had a slim case to begin with, made the decision to push that to the penalty phase. But there's a real problem in terms of, at least an arguable IAC claim, in terms of the promise that the defense counsel made in the opening statement, that he would show an intoxication defense, right? No, Your Honor, because the way the courts have addressed this, and certainly it is not optimal to make statements and not be able to back those up, but things happen in the course of trials. And that's what the state court recognized in this. I mean, this was something that counsel did not anticipate. Something didn't anticipate the substance of her testimony, and that that decision was a direct response to that. But that does raise the question that's been raised before. What specifically is the linkage between the intoxication and the Lori Carter? I mean, why would the Lori Carter testimony, in the absence of anything having to do with intoxication, cause counsel to say, intoxication is not something that I want to press with the jury? I think counsel at that point realized that it was not going to be successful. It couldn't prevail. The proof was just too strong. They didn't have the proof for intoxication. They had evidence of intoxication, but they didn't have sufficient proof to make an intoxication, a true intoxication defense, required much more than what they had. And with this evidence, there's no way that that was going to be successful. That was the judgment that he made. So the only reason to present it at all is if you're pretty sure you're going to win with it. Well, if there's some reasonable chance that you can plant some seed of doubt in the jury's mind, and I think that's what he was thinking. If we can just show that. I don't recall anything in the way defense counsel articulated his reasoning that had anything to do with the fact that after hearing Kerry Carter's testimony, the jury might not have the patience to, it wasn't going to help him at the penalty phase for the jury to have heard anything more about how drunk he was at the guilt phase. He didn't say that was the reason. He didn't say what he said specifically was. The testimony of Lori Carter was devastating, and then he went on to describe those things, the way she described it, the graphic nature of it, especially how the next woman he killed would feel. He said pretty devastating stuff. It had no business in your case in chief talking to the DA, but we had already addressed that with the court. But that really skewed our defense, and we wanted out of that phase as quick as we could and focused the jury on our side of the case at penalty. Yeah. So I guess it wasn't exactly what I said, but pretty close. It was very close, yes. I mean, I think those kinds of judgment calls happen in the course of every trial, especially when you're dealing with something that you don't expect. Well, why wouldn't you continue with the intoxication defense? If you think you've already lost on the guilt, why wouldn't you at least try something that might make him more sympathetic, arguably? Because the intoxicant, well, I mean, to answer your question, you could have. I mean, that's one choice. That's one choice among two options. You can go forward with the way it was your plan, or you can change your plan and shift. That's certainly an option and a reasonable one. But deferring is also reasonable, because the intoxication evidence goes hand in glove with the social history in the background and the story that counsel ultimately told in the penalty phase about this deterioration that Mr. King had after the death of his father and his use of drugs and that sort of thing and how this sort of culminated in a series of criminal events. This wasn't the only crime. He'd already committed a murder. It was one of his aggravating circumstances. And even after he killed Ms. Smith, he trolled a Walmart parking lot and was planning to pick up and rape another woman. So this is not a person who just has had one or two events. But in order to deal with that, he has to paint a story and explain how all the intoxication fits in. So it fit perfectly with the mitigation proof. If we could shift. As I understand it, there's a second issue that the COA was granted on, which has to do with the failure to get an expert on organic brain damage. And everybody accepts, as I understand it, that the trial counsel misunderstood the law, did not know that there would be a state-funded expert. So that would seem to be a fundamental flaw. There was a change in the law two months before counsel was appointed in this case. In May of 84, the statute changed and allowed for the ex parte. Counsel came on and had six months to prepare, was unaware of the change in the law. So that was an error. So if we assume deficient performance and get to the heart of the case from the other side's perspective, they're needing to show prejudice. Why isn't this a fundamentally prejudicial situation where the defense counsel does not hire an expert in time for the trial to show that there's organic brain damage when the fellow has been inhaling all of these substances and had injuries, et cetera? Well, I'm not willing. You don't want to give me all of that. We can talk about that. On the prejudice, the reason there's no prejudice, and as the state court found, the testimony, counsel's complaint about that and the petitioner's complaint about it all along had been he waited, he wasn't aware of the law, so he waited until he got sufficient funds from the family in order to hire the expert. So instead of getting the expert five months out, he got the expert the month of the trial. This is Gebro. This is Gebro. So the whole complaint about counsel's performance has been the delay and what was the effect of the delay. So the reason that it's not deficient is because counsel actually got Gebro, got an evaluation. But Gebro says, and the key is prejudice that we're trying to analyze. Gebro says, I think we need to have an EEG because we need to see if there's organic brain damage. And there wasn't an EEG in time for the trial. That's true. And petitioner had all the time he needed to provide evidence of organic brain damage in his post-conviction proceeding to demonstrate the very prejudice that Your Honor is seeking, and he failed to do that. When did the state trial court deny leave to have him examined for the EEG? During trial? That was during trial? He withdrew the request for the EEG. The sequence of events as I understand it is that the evaluation took place. Expert was retained on January 15th. Evaluation took place on the first day that jury selection began on, I believe, the 23rd. There was a report produced on the 27th, and I don't know where all this falls in, but after the report which recommended the EEG, counsel requested to have Mr. King transported for an EEG consistent with the recommendation in the report. There was a hearing on that, and Dr. Dubrow testified about why he wanted the EEG. And essentially what he said was, I think there's testimony of this huffing, and that could be an indication of organic brain damage, and so I'd like to just do the test because this test could show indications of damage. And bear in mind, too, that the question at this point and the question on which the mental health was noticed was insanity. Counsel had filed a notice of insanity to preserve the issue, and so the testimony and the hearing was focused on whether or not that proof, that test was necessary for Dr. Dubrow to make, to render a decision about whether Terry King met the legal definition of sanity under Tennessee law, and that was the subject of the hearing. The trial court found, and the testimony was equivocal. He said, well, it could show something, and he was questioned, well, would that establish insanity if it showed evidence of organic brain damage? And the experts said, well, it might. So it was very, you know, it could show this, it might show this, but I really need this to complete my report. So because his testimony, he did not testify that the testing could demonstrate insanity. The trial court denied the request at that time, but allowed the psychologist to go and do the evaluation at the jail, which occurred. The psychologist is who? I believe it was Mendez. At the close of the state's case, Dr. Dubrow was called again by the state, and in the course of that conversation, to determine whether or not he was going to be presented, in the course of that conversation, as I recall, and I hope I'm not misstating, the prosecutor specifically made the statement that Dr. Dubrow had indicated he was no longer requesting EEG. The request was actually withdrawn. Wasn't that as a direct result of the trial court's ruling on not ordering the EEG initially because Dubrow hadn't reviewed all the materials, all the testing that had been done? That's correct. And it was after he reviewed those that Dr. Dubrow said the EEG was not necessary. That's exactly right. And that's where we were left at the end of the penalty. Right. That's exactly right. And so it was Dubrow himself that withdrew that request for the EEG, even though he had initially recommended it. Then in terms of prejudice, what the court determined on that was that- The court meaning which court? Oh, I'm sorry, the Tennessee Supreme Court. Tennessee Supreme Court. And the state post-conviction court. And I do want to get to that because there were some comments in the reply brief about the fact that this court is absolutely confined to the four corners of the state Supreme Court decision. The state Supreme Court is reviewing findings and a record made below. And so what the court said was that the record did not preponderate against the trial court's findings that petitioner could not have gotten a better result or better outcome from a psychological evaluation or mental health evaluation even if he had not delayed in getting the evaluation that he did. And that was based on the testimony of Dr. Auble at the post-conviction, who basically said that- and we've described this some and this is in the record- basically that Terry King has antisocial personality disorder. He's got a variety of other ills, depression and things of that nature and impulse control. But in her report, in her testimony on page 255, Dr. Auble specifically references Dr. Kaminsky. Did Dr. Auble see the Kaminsky report? You know, the testimony, it's unclear. The testimony that she gave in state court is that it showed negative results. Dr. Kaminsky gave him an EG, didn't he? Auble answered, that's right. And it showed negative results, didn't it? And she said, that's correct. Now in her report, she says, I do not have Dr. Kaminsky's report. So I don't know if- I don't know the succession of events and how she would have known that. I don't know if she had seen it or not. But if it's explained in the record, I didn't find it. Okay, so on the basis- and I apologize if these are elementary questions. On the basis of the evidence at the post-conviction stage in state court, you have Auble who has made a reference to Kaminsky's EG and said that there are negative results. Correct. Is there any evidence at the post-conviction phase or earlier? In other words, while we're still in the state court phase, is there any evidence of organic brain damage? If there is, I'm not aware of it. I was not aware that that came up until after the fact. Okay, because there are three experts that are at the federal habeas stage that are talking about the existence or the possibility of organic brain damage. But if we're just looking at post-conviction and the state court proceeding, you're saying there's nothing. But the question, and I think- That's correct. The short answer is that the post-conviction court, both at the trial court level and the Tennessee Supreme Court, examined the evaluations and the results that Dr. Gibral came up with as opposed to, in comparison to Dr. Auble, and found that they were not terribly dissimilar, that there were many similarities, and that Dr. Auble's testimony did not rise to the level to show that there was any prejudice from not going forward with Dr. Gibral's testimony. So is there, again, in terms of the Strickland analysis, there's the question of deficient performance and prejudice. So are you saying that there is a state court opinion on the issue of organic brain damage and the failure to get an expert at an earlier phase? Is there an actual finding of the state courts that there was no prejudice, so that we would review under AEDPA? There is a finding by the state court that there is no prejudice. Which state court? In the Tennessee Supreme Court, on page 333, the Tennessee Supreme Court said, the trial court, meaning the post-conviction court, reviewed Dr. Auble's testimony and determined that her evaluation provided little information in addition to that previously discovered by Dr. Gibral. The trial court concluded, therefore, that even if defense counsel had initiated the mental health evaluation earlier, there was no proof that a more favorable report would have been obtained. We find no evidence to preponderate against that finding. And they go on to say the record reflects that counsel presented evidence through lay witnesses and that was remarkably similar to the information provided by Dr. Auble in terms of the social history and background in drug use. So is that a finding of no deficient performance or is that a finding of no prejudice? That's a good question. I think it could be read as sort of an amalgam, but I think certainly it could be read as a finding of no prejudice based upon a factual determination about the strength of Auble's testimony. Because it's a mixed question, obviously it affects the way that the state court can look at it. So the Tennessee Supreme Court is reviewing what the state court did to determine whether the evidence supports it and the post-conviction court found that they were very similar. There were very few material discrepancies and the court accepted that and found that the evidence supported it. But I think definitely in terms of prejudice, the state court clearly found that the record supports it. And that's why we've said in our brief there are several references to materials that are outside of the record. There was a full evidentiary hearing in the state post-conviction court and the petitioner simply couldn't make the case. Petitioner's counsel's main claim was that if only I had more time, I recognized I made an error, if only there were more time, I could have gotten a second opinion and gotten a better report. They had more time, they got a second opinion from Dr. Auble and the report was the same. In fact, when the court reviews the testimony and the cross-examination of Dr. Auble by the district attorney, it was really devastating. And when she was presented with the facts of the crime, her conclusions about the impulsivity of this particular event would never have stood up. But did these three fellows, Merkengass, Sadoff, and Smith, do any different testing that resulted in their very different opinions? I think there were some additional testing. They did an MRI and they did some other things that are outside. But the chance to do that was at the post-conviction phase and they didn't do that. If I could, if I might, one point I would want to make, and I'm out of time, if I can have just an extra minute, and it has to do with the other, Ms. Chavis indicated that there was a factual misstatement by counsel about his reasoning for rejecting the Gebrau report. And I'm just going to back just really quickly to this deficient performance prong on the error. Counsel made an error with respect to the change in the statute. But in our view, the error is only significant to the extent that it impacted whether or not his investigation was deficient in terms of the mental health. He recognized early on, and by early on, I mean we're talking about a six-month space of time, so we don't have a lot of time to begin with. So he recognized early on that there was a possible benefit to mental health. He investigated the background, talked to family members, thought of notice of intent to rely on the insanity defense to preserve that issue, obtained private funds from King's family, retained a competent expert, obtained an evaluation that he found not helpful. He rejected that. He testified because, number one, Terry King had lied to Dr. Gebrau, and that was going to be brought out. And number two, Dr. Gebrau had made a statement to him about Terry King wanting to hurt people, just the kind of person who wants to hurt people. In fact, Terry King did lie. He did not admit responsibility in his statement to Dr. Gebrau. He tells Dr. Gebrau that Joe, his co-defendant, claimed that he had shot the woman. He was perpetuating this sham that he and his co-defendant cooked up before trial where the co-defendant did this sham suicide note and said, I told you that you did it, I told you that you were knocked out and you did it, but you really didn't do it. All along it was me. So in this statement, this goes right along with that. So he wasn't truthful about what he did. He said he couldn't remember anything. Everything he talked about in the crime was what he said that Joe Sexton told him he had done. So he was not truthful to Dr. Gebrau, and there's no testimony in the state court record to suggest that Dr. Gebrau did not say to Mr. Simpson exactly what Mr. Simpson said that he said, and those are both reasonable bases for deciding not to pursue that testimony. But even beyond that, none of the testimony that came out through Dr. Auble would have done anything to materially enhance what Dr. Gebrau already found, and that's the reason that this case is different from the Hinton case that the petitioner is relying on. In Hinton, there was a similar error of law, but in that case, counsel retained an expert who was incompetent. Counsel knew he was incompetent and presented him nevertheless, knowing that he was incompetent because he didn't know that he had any other alternative. In this situation, counsel retained a competent expert and got an opinion. He got the opinion in January instead of in September or October, but he still got the opinion. Lots of preparation for trials happened at the last moment. He actually did exactly what he did, and the fact that he got it here instead of a little bit earlier, there really is nothing in the record to indicate that it would have been any different, and that's what the court ultimately found, is that he didn't show that the additional time would have benefited him. If there are no further questions, we ask that the court affirm the judgment of the district court. Thank you, counsel. Rebuttal? Thank you, Your Honor. Very quickly, I am going to go back to deficient performance, but then I want to focus on prejudice because that's extremely important. But with respect to the Lori Carter testimony, we need to remember that the Tennessee Supreme Court, on direct appeal, said that that testimony, the relevance of that testimony to the issues was tenuous at best. It should not have been admitted, but the court found that to be harmless error. Even given the fact that counsel thought that Lori Carter said that Terry King was sober, and the Tennessee Supreme Court relies on that statement of sobriety in its opinion in page 333, that is the key, is the sobriety. But even given that, there was reason to present the intoxication defense, because number one, counsel promised it, and number two, the jury just had to credit an expert's testimony to the extent that it raised a reasonable doubt that Terry King was unable to form specific intent in order to be guilty of first-degree murder. And we know, again, this is important. This failure of counsel to obtain this and present this evidence is important because the fact that he didn't present any evidence of intoxication is reason... Or the fact that he didn't present any evidence. Defense counsel did not present any evidence. The evidence was in Terry King's confession and statements that was brought in by the prosecution. Yes, Your Honor. But what's important is that trial counsel denied a lesser-included offense instruction in this case, and the trial court said if you had just presented some evidence of intoxication, we would have given it. And counsel said that that instruction would not have been given, but in fact the Tennessee Supreme Court said that it was error that the court did not give that instruction. The court should have given that instruction because what happened in this case is that the jury was presented with a defendant whose counsel admitted to the crime, who did not contest Terry King's actions, but mental state was the issue. So the jury had a choice between acquitting a defendant who the jury knew engaged in criminal conduct and the choice of convicting him of capital murder. And here we know that the jury credited even that slim evidence of intoxication that was in King's statement because the jury did not convict King of premeditated murder. Instead, they convicted on felony murder. And it's also important that the trial court in its trial... The report that the court issues at the end of the trial, and this is in the supplemental appendix, the court indicated that at appendix 341 and 342, and this is because the judge knew information that the jury didn't, the court said that drug and alcohol consumption actually contributed to the offense. And the court also said that the trial judge found at appendix 336 and 340 that there was possible organic brain syndrome, and the court noted the trial counsel failed to present that proof to the jury. So this is extremely important with respect to the prejudice and the guilt phase, but then even if the jury convicted Terry King of first-degree murder, all of this evidence goes to mitigating circumstances. The statutory mitigating circumstances in Tennessee's code contain mental components, and without the expert evidence that Dr. Auble provided, the jury simply could not make a nexus, could not connect the facts of Terry King's intoxication to his mental state and then give weight to those statutory mitigating circumstances. Another thing that Dr. Auble's testimony did was that it decreased the weight of the aggravating circumstances. The aggravating circumstances also contain mental state components. In particular, the heinous, atrocious, and cruel aggravator, because that requires depravity of mind. And Dr. Auble's testimony went to King's mental state, and she also testified about King's deeply held remorse. With respect to the prior violent felony aggravator, Dr. Auble's testimony would have mitigated that aggravator Because she described the same circumstances where Terry King again is accompanied by Joe Sexton, he's extremely intoxicated in the prior killing and in the current killing. And it's important that in this case, the co-defendant and King were tried together, and that prior felony aggravator was also present for Joe Sexton. And Joe Sexton, that wasn't enough for the jury to give Joe Sexton that. And in that case, Joe Sexton was the trigger man. Terry King wasn't. So the expert evidence not only provides that nexus that the jury needed to give weight to the statutory mitigating circumstances, but it reduces the aggravation that was presented. And remember, in looking at the totality of the circumstances, we're dealing with three aggravators, not four, like back at trial, because the Tennessee Supreme Court struck the felony murder aggravator as being in violation of the state constitution. You're honored to get to the issue of brain damage. We get there because the state court decision with respect to prejudice is based on an unreasonable determination of facts under 2254D. And once we clear that hurdle on the state's prejudice decision, then the court reviews the issue of prejudice de novo. And it reviews the issue based on all of the evidence in the expanded record that's before the district court. And we know that the state court decision is unreasonable with respect to prejudice because on page 333, the court says again that Dr. Abel presented nothing different than Dr. Gabbro, but that's not the correct comparison. Dr. Gabbro didn't testify before the jury. The court's not engaging in the correct analysis. That's not the correct question there. And number two, lay witnesses. The court found no prejudice because they said that the lay witness testimony was remarkably similar to that testimony by Dr. Abel. And we know legally that's not true. And then looking at what each had to say, it's not true. Lay witnesses are simply incompetent to present that evidence with respect to mental state and how that connects to a person's culpability. We know that. The Supreme Court has told us time and again that with respect to whether or not a person is able to make correct decisions, whether a person is able to suppress their impulses, to conform their behavior to the law, to make deliberate choices, that's highly relevant in capital sentencing proceedings. And the Supreme Court tells us that in Sears and in Porter and in Williams, and only expert testimony can provide that evidence. That's where the prejudice is in this case. And in Cohn v. Bell, the Supreme Court talked about how weighty Tennessee's what they call the J-8 mitigating circumstance is. And lay witnesses are not qualified to testify to the J-8 mitigator, which deals with mental impairment due to mental disease, defect, and intoxication, and how that substantially affects judgment. Only expert evidence can provide that information for the jury so that they can then weigh it when determining King's culpability. So, yes, we think that we've passed through 2254D with respect to deficient performance and with respect to prejudice. And once we get past that, then this Court looks to all of the evidence in the record. And we know Dr. Booher, had he been contacted earlier, would have found that voluntary intoxication negated specific intent. We know that because Dr. Booher's report tells us that. That's in front of the Court. We know that Dr. Booher would have discussed the effects of brain damage on Terry King at the time of the crime. So, we would ask the Court to find that, yes, we've passed through 2254D. We've shown the State Court decision is unreasonable. And that even based on the post-conviction evidence, Dr. Alba's testimony, that we have established prejudice. Now, I know that this case comes to the Court in the summary judgment posture. And if there's any question when this Court is considering prejudice de novo, based on the entire expanded record, if there's any question of that, it would be entirely appropriate to remand the case so that the district judge, the trial judge, could then review that expanded record and make a determination at that point. Thank you, Counsel. Thank you, Your Honor. The case will be submitted. Clerk may adjourn the Court.